# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

CARLOS MARQUIS LOVE, JR.,

      Defendant-Appellant.

UNPUBLISHED
July 21, 2016

No. 324992
Wayne Circuit Court
LC No. 14-002709-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

DANTRAZ JAVON OLIVER-MCCLUNG,

      Defendant-Appellant.

No. 325107
Wayne Circuit Court
LC No. 14-002709-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellant,

v

CARLOS MARQUIS LOVE, JR.,

      Defendant-Appellee.

No. 329217
Wayne Circuit Court
LC No. 14-002709-FC

---

Before: GADOLA, P.J., and SERVITTO and SHAPIRO, JJ.

PER CURIAM.

In these consolidated appeals, defendants Carlos Love and Dantraz Oliver-McClung were tried together before separate juries. Each defendant was convicted of three counts of first-

-1-

degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(d)(*ii*), and four counts of assault with intent to commit criminal sexual conduct involving sexual penetration, MCL 750.520g(1). Each was sentenced to 14 to 30 years' imprisonment for the CSC-I convictions and 5 to 10 years' imprisonment for the convictions of assault with intent to commit criminal sexual conduct involving sexual penetration. Love filed a motion for new trial, which the trial court granted after concluding that Love had been deprived of his right to counsel under *United States v Cronic*, 466 US 648; 104 S Ct 2039; 80 L Ed 2d 657 (1984). Defendants appeal their convictions as of right and the prosecutor appeals by leave granted[1] the trial court's order granting Love's motion for a new trial. In Docket Nos. 329217 and 324992, we reverse the trial court's order granting Love a new trial and remand for an evidentiary hearing pursuant to *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973). We reject all of Love's remaining claims of error, save for his challenge under *People v Lockridge*, 498 Mich 358; 870 NW2d 502 (2015), which we do not reach given our remand for a *Ginther* hearing. In Docket No. 325107, we affirm Oliver-McClung's convictions, but remand for resentencing pursuant to *People v Francisco*, 474 Mich 82; 711 NW2d 44 (2006).

## I. BASIC FACTS

On March 5, 2014, Shantia Smith, the complainant, was at a birthday party in a one-bedroom apartment. Smith, who was 19 years old at the time, testified that there were about eight or nine boys at the party and about six girls. Love and Oliver-McClung were both at the party, and almost everyone, including defendants and Smith, was smoking marijuana. Smith testified that, at some point, everyone was playing a drinking game during which she indicated that she had never had a threesome. She testified that around that time, the males started "grabbing on" the girls. She said that a male with sideburns tried to grab her and get intimate with her. The male, whom Smith referred to as "Sideburns," made her uncomfortable, and she went into the hallway outside the apartment because it was getting crowded inside.

Smith testified that Oliver-McClung came into the hallway and talked to her. She testified that he was being nice, that she thought he was "pretty cool," and that she became more relaxed and returned to the party. Smith testified that Sideburns approached her, tried to talk to her again, and that the situation became aggressive again. She testified that Sideburns grabbed her arm and pulled her toward the bedroom. She said that Oliver-McClung followed and another individual with a medium build, whom she referred to as Medium, approached from another direction. Smith testified that she grabbed the doorway to the bedroom and called out for Destiny Herring, who was at the party, but Herring acted like she did not hear her.[2]

---

[1] *People v Love*, unpublished order of the Court of Appeals, entered October 27, 2015 (Docket No. 329217).

[2] Herring testified that she did not know what happened in the bedroom. She stated that Smith walked into the bedroom with only Oliver-McClung and that no one else joined them. She further testified that at some point Smith and Oliver-McClung left the room after which Smith

-2-

Smith testified that Sideburns, Medium, and Oliver-McClung all pushed her into the bedroom despite her attempts to push them off. They closed the bedroom door and Sideburns pulled down her leggings. Smith testified that she pulled her leggings back up and tried to leave, but the door was blocked by Medium and Oliver-McClung. She testified that she yelled "stop" and "no," and that Sideburns, who was standing behind her, pulled her leggings back down and said, "You've been saying 'no' to me all night." She testified that he shoved her down and vaginally penetrated her with his penis while Medium and Oliver-McClung were standing in front of her. She testified that she tried to stop it from happening. She also testified that Sideburns tried to penetrate her anus with his penis, but that he failed to do so.

Smith testified that after vaginally penetrating her, Sideburns tried to force her to have oral sex with Oliver-McClung and Medium by pushing her head toward them while their pants were down. She testified it was so dark in the room that she could not see their penises, but she knew that they were out of the assailants' pants because they touched her face.

Smith went on to testify that after Sideburns was finished, the men switched positions, and Oliver-McClung vaginally penetrated her from behind. She testified that she did not want Oliver-McClung to do so and that she tried to stop him. She also testified that Medium continued to try and force her to give him oral sex while Oliver-McClung penetrated her vaginally.

At some point another individual that Smith identified as Love entered the room. Smith testified that it was very dark in the room, but that when Love opened the door to come in light from the hallway momentarily shone into the room. She testified that after Oliver-McClung finished, Love vaginally penetrated her from behind with his penis. She testified that she did not want Love to do so and that she tried to stop him.

Smith testified that three, maybe more males, penetrated her vaginally, but she did not know if any of them ejaculated. Further, she testified that each male who penetrated her held her down during the assault so that she could not get up. She also testified that while Love and Oliver-McClung were in the room, someone said that if she just gave someone oral sex it would "be over with." She estimated that the assaults lasted approximately 45 to 50 minutes.

After the sexual assaults were over, Smith left the apartment, went to the stairs in the building, and sat there. She testified that she saw the males leave together and then went back into the apartment to charge her phone. In the apartment, she was crying on the bedroom floor

---

went into the bedroom with a second male and that this process was repeated with a third male. Herring added that at some point Love went into the bedroom while Smith was already in there with one or two other males. Alison Anderson, another party guest, testified that she saw Smith grab Oliver-McClung's hand and walk into the bedroom with him. She testified that a lot of males went into the bedroom after Oliver-McClung came out, including Love. She testified that she was upset because she had planned on being with Love that night and she thought that Love was doing something sexual with Smith based on the way he went into the room and came out.

when Herring and Anderson entered the room and asked her something.[3] She testified that she did not respond because she felt like she was set up. She called her best friend after her phone was charged, but did not tell her what happened and instead just cried. Smith's sister then called her, and Smith asked to be picked up. She did not tell her sister what happened. Before her sister arrived, a male friend of Smith's arrived and she spoke with him in the building's common laundry room. While they were speaking, she saw Love and Oliver-McClung's brother go into the apartment.[4]

Smith testified that she went outside and saw that her sister and mother had arrived. She stated that she started crying and told her mother what happened. Her mother called the police and Smith was taken by ambulance to the hospital. A sexual assault nurse examiner (SANE) examined her and a rape kit was done. The SANE nurse testified that Smith did not have internal or external injuries. She explained, however, that the lack of injuries was not unusual due to the elasticity of the vaginal tissues. She also testified that she took samples from Smith's vagina and anus. A forensic scientist with the Michigan State Police testified that while the DNA of two men was found in the samples, both Oliver-McClung and Love were excluded as donors.

Detroit Police Officer Stanley Suski responded to the scene around 3:11 a.m. He testified that he knocked on the apartment door, but did not hear any movement or noise inside. He left around 5:26 a.m. Herring and Anderson testified that several people, including Love, went to sleep in the apartment. Herring testified that she was asleep when the police knocked; however, she sent a text message to Gina Hawkins, another party guest, stating that the police were at the door. Herring testified that she later woke up to the sound of someone knocking and saying that there was a fire. She testified that they left the apartment and that some of them went to Love's apartment.

Captain Winston Farrow was called to testify regarding a fire that consumed most of the apartment building a few hours after the party took place. Farrow, a fire and arson investigator, testified that the apartment building was on fire when he arrived and that it took two days to extinguish the fire. The most damage to the building was in the corner where the apartment at issue in this case was located. Although a trained dog detected a petroleum-based product or accelerant, the water used to put out the fire diluted the dog's ability to find the accelerant. Captain Farrow testified that, although he did not believe it was an electrical fire, he was unable to rule it out and he could not determine conclusively what caused the fire.

---

[3] Herring and Anderson both testified that they saw Smith on the bedroom floor, but they said she was not crying.

[4] Herring testified that she found Love's phone in the apartment and called him to let him know. Herring and Anderson testified that Love and Oliver-McClung's brother then returned to the apartment.

After Smith returned from the hospital, the police showed her a photo array of six photographs that included Oliver-McClung's picture. She identified him as one of her assailants. The police also showed her a photo array of six photographs that included Love's picture, but she did not identify Love or anyone else in the array as an assailant. Later that day Smith looked at photos of the party that were posted on Herring's Facebook page. At least one of the posted photos included Love and she recognized him as one of her assailants. She took a screenshot of the picture and gave it to the police. The next day she selected Love from an in-person lineup at the police station.

Other evidence was presented against Love. Anderson and Herring testified that they were asked to go to the police station and that Love went with them. They both testified that on the way, Love instructed them to lie to the police and that, based on his request, they did so. Additionally, there was testimony that after the preliminary examination, Love's mother and an older man went to Smith's house. Smith testified that Love's mother asked her if she was "sure" that Love committed the crime and asked if they could "take this a different way." Smith testified that the man accompanying Love's mother offered her some money, but that she did not take it. After they left, Smith contacted the police and provided a statement that included Love's mother's phone number. Love's mother denied offering anyone money and denied visiting Smith. She testified that Smith had probably obtained her phone number from a police detective. Anderson and Herring also testified that Love's mother contacted them regularly after Love was arrested after which they gave Love's mother written statements identifying three men other than Love and Oliver-McClung. Love's mother, however, denied the frequency of her visits to Herring and Anderson and testified that she did not tell the girls what to say in the written statements she picked up from them.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Love and Oliver-McClung both argue that they were denied their constitutional right to effective assistance of counsel. We address their claims in turn.

## A. LOVE

Following his convictions, Love brought a motion for new trial. He argued that he was denied his right to effective assistance of counsel when one of his retained attorneys, Sanford Schulman, left in the middle of trial and did not return. The trial court held an evidentiary hearing to address the issue.

At the hearing, evidence was admitted showing that Chiketa Palmore-Bryant was initially hired by Love's family to represent Love. Palmore-Byrant conducted the preliminary examination, but she testified that she told the family that she would only represent Love until they could find a trial attorney. She explained that, although she had been an attorney since

2002, she had only conducted two criminal trials, neither of which was a capital case. She added that she also had Meniere's disease, which limited her ability to practice in open court.[5]

Love's family thereafter retained Schulman to represent Love.[6] Schulman testified that he told Palmore-Bryant that he was going to assist with the case, but that he was not going to substitute for her. Palmore-Bryant testified that she thought he was going to take over the case. She added that she informed Schulman that she had limited trial experience and had never tried a capital case. Schulman and Palmore-Bryant both testified that Palmore-Bryant was supposed to conduct some cross-examination of Smith; however, Palmore-Bryant did not believe that she was going to be conducting the entire examination.

Both Schulman and Palmore-Bryant were present on the first, third, and fourth days of trial.[7] During that time, Schulman conducted voir dire, joined in a motion in limine filed by Oliver-McClung's counsel, gave the opening statement, cross-examined several witnesses, and made objections. Although not reflected in the trial transcript, Schulman testified that at the end of the fourth day of trial, he informed the court that he was leaving to conduct a trial in West Virginia.[8] He testified that Love consented to his departure. The trial court stated that it recalled the colloquy, adding that Schulman had told Love:

> that you understand that I'm leaving now, I have to go to West Virginia on another matter, and he inquired of him as to whether or not he had any problem with that, and Mr. Love indicated, no, he didn't have any problem with that. I remember that specifically. Now, word for word, I don't know, but paraphrasing—wise, that's what my notes reflect.

The court added that Schulman indicated that he would try to come back as soon as he could but he did not know when he could come back. Love testified that when Schulman told the court he had to leave to handle another matter out of town, the court asked him "Is that okay with you?" He testified that he shrugged his shoulders because he did not understand what was being asked and did not know he could object to Schulman leaving.

---

[5] Palmore-Bryant explained that Meniere's disease involves fluid in the inner ear that can cause pressure buildup, vertigo, stomach sickness, passing out, and hearing difficulties.

[6] Schulman testified that his normal fee for acting as lead counsel in a case like this is $10,000. He testified that Love's family could not afford that amount, but that he agreed to assist for a $2,500 fee. He had no written contract with Love's family.

[7] The jury for Oliver-McClung was selected on the second day. Palmore-Bryant was present, but Schulman was not.

[8] Schulman testified that early on he had told Love's family about a possible scheduling conflict with a case in West Virginia. He explained that he believed the federal case would be resolved, but that he realized about a week before trial in this case that it would not be resolved. He testified that he told Love's family before trial that he would be absent for a part of the trial.

Schulman testified that Palmore-Bryant was nervous and apprehensive about him leaving, but said that she was working hard and was prepared. Palmore-Bryant, however, testified that because she did not know that Schulman was going to be gone for part of the trial, she had not planned on doing anything other than some limited questioning of Smith. She said that if she had known he was going to be absent, she would have prepared more. Regardless, Palmore-Bryant represented Love on the fifth, sixth, seventh, and eighth days of trial. During that time, she cross-examined witnesses, made objections, moved for a directed verdict, and gave closing argument. Schulman did not return until sentencing.

During the motion for new trial, Love argued that he was denied effective assistance of counsel because Schulman had a conflict of interest. He also argued that he was deprived of counsel of choice and that Schulman abandoned him resulting in a structural error under *Cronic*. The prosecutor, however, argued that there was no conflict of interest, that the state had not interfered with Love's right to counsel of choice, and that prejudice under *Cronic* could not be presumed because Palmore-Bryant continued to represent Love even after Schulman left. The prosecutor argued that the trial court was required to evaluate the ineffective assistance of counsel claims under the standards set forth in *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984). The trial court, however, disagreed and evaluated the case under *Cronic*.

The right to counsel is the right to the effective assistance of counsel. *Cronic*, 466 US at 654; *People v Pubrat*, 451 Mich 589, 594; 548 NW2d 595 (1996). Generally, challenges to the effectiveness of counsel are reviewed under the standard set forth in *Strickland*. *People v Frazier*, 478 Mich 231, 243; 733 NW2d 713 (2007). However, in *Cronic*, "the United States Supreme Court identified three rare situations in which the attorney's performance is so deficient that prejudice is presumed." *Id*. Prejudice is presumed if (1) there is a "complete denial of counsel at a 'critical stage' of the proceedings," (2) "counsel entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing," and (3) "counsel is called upon to render assistance under circumstances where competent counsel very likely could not." *Id*. at 243, 243 n 10, quoting *Cronic*, 466 US at 659-660 (internal quotation marks omitted). Here, the trial court found that Schulman abandoned Love, so prejudice was presumed. Although the trial court did not expressly identify which of the three situations it found applicable to Love's case, it appears that the court's ruling was based on the first two situations.

We conclude that the trial court misapplied *Cronic*. First, at no point was there a *complete* denial of counsel given that even after Schulman's departure Palmore-Bryant continued to represent Love. Second, counsel did not entirely fail to subject the prosecution's case to meaningful adversarial testing See *People v Gioglio*, 292 Mich App 173, 216, 223-224; 807 NW2d 372 (2011) (K F KELLY., dissenting) (holding that defense counsel subjected the prosecution's case to meaningful adversarial testing when, despite not presenting an opening statement, cross-examining some witnesses, or calling witnesses on behalf of the defendant, defense counsel met with the defendant, made successful motions, took other actions before trial, engaged in voir dire, cross-examined witnesses, made objections, sought a cautionary

instruction, and presented a closing argument).[9] Again, the record clearly reflects that after Schulman's departure Love was represented by Palmore-Bryant, who despite being an inexperienced trial attorney, was able to cross-examine witnesses, make objections, and present a closing argument. Accordingly, the trial court abused its discretion when it granted Love a new trial on the basis of a *Cronic* violation.

Love next argues that Palmore-Bryant was ineffective under *Strickland*. He asserts that Palmore-Bryant was ineffective on several grounds including: failing to seek an adjournment following Schulman's departure, failing to adequately cross-examine Smith, failing to discuss critical testimony during closing argument, and for soliciting inadmissible and prejudicial testimony from a police officer that Love had refused to answer questions and had requested counsel during a police interrogation. Given the trial court's concern and understandable ire regarding Schulman's unexpected mid-trial departure, these more specific *Strickland* concerns were either not addressed or received only cursory treatment at the hearing. Because we agree with the prosecution that this case should have been evaluated under the standards set forth in *Strickland*, we remand for a *Ginther* hearing to develop a factual record and to determine whether Schulman and/or Palmore-Bryant provided ineffective assistance of counsel. On remand, the trial court shall take additional testimony and shall make findings as to whether counsels' performance was deficient, and, if so, whether it was so prejudicial as to merit a new trial.[10]

---

[9] In *People v Gioglio*, 490 Mich 868; 802 NW2d 612 (2011), our Supreme Court reversed this Court's majority opinion in *Gioglio* and adopted the reasoning of the dissent. "An order of [our Supreme] Court is binding precedent if it constitutes a final disposition of an application and contains a concise statement of the applicable facts and reasons for the decision." *DeFrain v State Farm Mut Auto Ins Co*, 491 Mich 359, 369; 817 NW2d 504 (2012). Given the Court's adoption of the reasoning in the dissenting opinion, the order in *Gioglio* contains a concise statement of the facts and the reasons for the decision. As such, it is binding upon this Court. See *DeFrain*, 491 Mich at 370.

[10] Love also argues that he was denied his constitutional right to counsel of choice when Schulman left in the middle of the trial. We disagree. An element of the Sixth Amendment right to the assistance of counsel "is the right of a defendant who does not require appointed counsel to choose who will represent him." *United States v Gonzalez-Lopez*, 548 US 140, 144; 126 S Ct 2557; 165 L Ed 2d 409 (2006). A defendant is deprived of this right if he is erroneously prevented from being represented by the lawyer he chooses. *Id.* at 148. In *Gonzalez-Lopez*, the trial court erred when it denied the defendant his counsel of choice. *Id.* at 152. In this case, however, no governmental actor denied Love his right to counsel of choice. Instead, Schulman chose to leave in the middle of trial after being retained to represent Love and no state action was involved.

## B. OLIVER-MCCLUNG

Oliver-McClung argues that his defense counsel was ineffective under the standard set forth in *Strickland* because his counsel failed to request a limiting instruction after a police officer testified regarding a statement Love made to the police. However, the record reflects that immediately following the officer's testimony, the following exchange occurred:

> *Defense counsel*: Your Honor, I would ask right now with a judicial limiting instruction that this isn't going to be used against my client. Do you have any problem with that?

> *The prosecutor*: No problem.

> *The Court*: This is only to be considered and construed relative to the Defendant Carlos Love. . . .

Thus, contrary to Oliver-McClung's argument on appeal, it is apparent that a limiting instruction was actually given. Accordingly, Oliver-McClung cannot establish that his counsel was ineffective. See *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001).

## III. JUDICIAL MISCONDUCT

We next address allegations of judicial misconduct. During the prosecutor's case-in-chief, the trial judge questioned Herring, Anderson, and Hawkins. Following the questioning of Herring, Oliver-McClung moved for a mistrial, arguing that the trial judge acted as a prosecutor when he challenged Herring's veracity. The trial judge denied the motion. On appeal, defendants argue that the judge's questioning of Herring amounted to judicial misconduct requiring reversal. Oliver-McClung also argues that the trial court erred in denying his motion for a mistrial based on the judge's questioning.[11] We disagree.

The trial judge questioned Herring as follows:

> *The court*: Okay, all right, okay. But before you went down to the police station, before you went down in this car with Carlos Love, you had texted people that Shantia Smith was complaining of possibly being raped by someone; is that right?

> *Herring*: Yes.

---

[11] "The question whether judicial misconduct denied [a] defendant a fair trial is a question of constitutional law that this Court reviews de novo." *People v Stevens*, 498 Mich 162, 168; 869 NW2d 233 (2015). This Court reviews for an abuse of discretion a trial court's decision whether to grant a mistrial. *People v Waclawski*, 286 Mich App 634, 708; 780 NW2d 321 (2009).

*The court*: Yes or no?

*Herring*: Yes.

*The court*: Okay. So you knew when you went down to the police station that there was something amiss; that this reason that the police wanted to talk to you had to do with Shantia Smith and the contention that she may have been raped by someone, isn't that true?

*Herring*: Not at the moment because the lady never—

*The court*: What do you mean "not at the moment." I don't understand what the heck you're saying, "not at the moment." What is a moment?

*Herring*: Not at that time because she never explained it to me.

*The court*: No, no, no. Let's go—let's go back again.

*Herring*: Okay.

*The court*: You gave text messages, right, saying that Shantia Smith had complained of being raped, is that true?

*Herring*: Yes.

*The court*: All right. And then you wind up going to a police station because the police want to talk to you, right?

*Herring*: Yes.

*The court*: How often do you go to a police station to talk to the police? Is this an everyday occurrence?

*Herring*: No.

*The court*: When is the last you time you went to the Detroit Police before March 5, 2014 to give a statement to the police?

*Herring*: Never.

*The court*: This is a pretty rare occasion, isn't it?

*Herring*: Yes.

*The court*: You knew full well then when you went to the police station why they wanted to talk to you, didn't you?

*Herring*: I really did not know at all.

-10-

*The court*:  You think we're that stupid?

In evaluating a claim of judicial misconduct, we look to see whether the judge's conduct deprived a party of a fair trial by piercing the veil of judicial impartiality. *People v Stevens*, 498 Mich 162, 164; 869 NW2d 233 (2015).  "A judge's conduct pierces this veil and violates the constitutional guarantee of a fair trial when, considering the totality of the circumstances, it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party."  *Id*.  In evaluating a claim of judicial misconduct:

> the reviewing court should inquire into a variety of factors including, but not limited to, the nature of the trial judge's conduct, the tone and demeanor of the judge, the scope of the judicial conduct in the context of the length and complexity of the trial and issues therein, the extent to which the judge's conduct was directed at one side more than the other, and the presence of any curative instructions, either at the time of an inappropriate occurrence or at the end of trial. [*Id*.]

Here, the broad nature of the judicial intervention—questioning of a witness by the trial court—is not improper.  See MRE 614(b) (permitting judicial questioning of witnesses).  Such questioning can "produce fuller and more exact testimony or elicit additional relevant information."  *Stevens*, 498 Mich at 173.  However, "[i]t is inappropriate for a judge to exhibit disbelief of a witness, intentionally or unintentionally."  *Id*. at 174.  "It is essential that the judge not permit his own views on disputed issues of fact to become apparent to the jury."  *Id*. (quotation marks and citations omitted).  Further, "[a] judge should avoid questions that are intimidating, argumentative, or skeptical."  *Id*. at 175.

Although the judge's questioning exhibited clear disbelief in Herring's testimony and although some of the questioning appears to have been argumentative or skeptical, when examining the totality of the circumstances, we are not convinced that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against Love or Oliver-McClung.  First, Herring was a prosecution witness, and although much of her testimony tended to favor defendants, she did testify in ways that supported the prosecution as well, including by testifying that Love went into the bedroom while Smith was in the bedroom.  Hence, it is not clear that the expression of disbelief concerning one aspect of Herring's testimony was directed toward one or the other party such that it would constitute biased judicial questioning.  Additionally, the portion of Herring's testimony with respect to which the trial court expressed disbelief, i.e., whether she knew the reason why she was being called to the police station, was not central to the issue of guilt or innocence.  Further, Herring admitted numerous times at trial that she had lied to the police on multiple occasions and that she had, in fact, lied during earlier portions of her testimony.  As such, the effect of the judge's questioning was lessened by her already strained credibility.  The prejudicial effect of the questioning was also limited given that this was an eight-day trial and the judge's questioning was, in context, relatively short and isolated.  Finally, the trial court also instructed the jury that its questioning of the witnesses was not meant to reflect its opinion of the evidence and that its comments, questions, and instructions were not evidence.  Given the totality of the circumstances, the court

-11-

did not commit misconduct.  For these same reasons, the trial court did not abuse its discretion in refusing to grant Oliver-McClung's motion for a mistrial.  See *People v Horn*, 279 Mich App 31, 36; 755 NW2d 212 (2008).[12]

Finally, Oliver-McClung's assertion that the trial court's questioning of Herring likely had a chilling effect on his decision whether to testify is entirely speculative and he cites nothing in the record to support it.  As such, he has failed to satisfy his burden as the appellant to furnish a record verifying the factual basis of his argument.  See *People v Elston*, 462 Mich 751, 762; 614 NW2d 595 (2000).

## IV.  SUFFICIENCY OF THE EVIDENCE

Love next argues that there was insufficient evidence to support his convictions.[13]  In order to convict a defendant of CSC-I under MCL 750.520b(1)(d)(*ii*) the prosecutor must prove beyond a reasonable doubt that: (1) defendant engaged in sexual penetration with another person, (2) the defendant was aided or abetted by one or more other persons, and (3) the defendant used force or coercion to accomplish the sexual penetration.  MCL 750.520b(1)(d)(*ii*).  The elements of assault with intent to commit CSC involving penetration are "(1) an assault, and (2) an intent to commit CSC involving sexual penetration."  *People v Nickens*, 470 Mich 622, 627; 685 NW2d 657 (2004).  Additionally, identity is an element of every criminal offense.  *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008).

Love argues that there was insufficient proof that he was one of the individuals that sexually assaulted Smith.  We disagree.  At trial, Smith testified that Love sexually penetrated her vagina with his penis.  Love seeks to discredit this testimony by pointing out that Smith testified that Love assaulted her from behind in a completely dark room.  He also points out that his DNA was not found on Smith.  However, a complainant's uncorroborated testimony is sufficient to convict a defendant of a CSC offense.  *People v Hallak*, 310 Mich App 555, 564; 873 NW2d 811 (2015), reversed in part on other grounds 499 Mich 879 (2016).  Moreover, we

---

[12] Love also argues that the judge engaged in judicial misconduct when it questioned Anderson and Hawkins.  He does not direct us to any specific judicial questioning of Hawkins.  He does refer us to leading questions asked of Anderson, including asking her to confirm that Love went into the bedroom while Smith was in the bedroom.  After review of the judicial questioning of Hawkins and Anderson, we conclude that the questioning did not exceed the court's prerogative to ask questions so as to "produce fuller and more exact testimony or elicit additional relevant information." *Stevens*, 498 Mich at 173.

[13] We review de novo challenges to the sufficiency of the evidence.  *People v Odom*, 276 Mich App 407, 418; 740 NW2d 557 (2007).  We view the evidence "in the light most favorable to the prosecution to determine whether any rational trier of fact could have found that the essential elements of the crime charged were proven beyond a reasonable doubt."  *People v Lundy*, 467 Mich 254, 257; 650 NW2d 332 (2002).

will not interfere with the jury's determination regarding the credibility of witnesses. *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008). Accordingly, Smith's testimony was sufficient for the jury to find that Love was one of the assailants.

Love also argues that there was insufficient evidence that he used force or coercion to commit the sexual assault. Again, we disagree. The use of force or coercion is not limited to physical violence and is to be determined in light of all the circumstances. *People v Brown*, 197 Mich App 448, 450; 495 NW2d 812 (1992). In *Brown*, there was sufficient evidence to prove force or coercion when the defendant forced himself on the victim after disregarding her requests to go home and to refrain from engaging in intercourse. *Id*. Here, Smith testified that Love was one of her assailants. She testified that she did not want him to vaginally penetrate her with his penis and that she attempted to stop it from happening. She also testified that everyone who penetrated her held her down during the assault. This evidence is sufficient for the jury to have found that Love used force or coercion to commit the sexual assault.

## V. EVIDENTIARY DECISIONS

Next, Oliver-McClung argues that the trial court abused its discretion when it denied his motion in limine to preclude evidence of the alleged arson of the apartment building where the sexual assaults took place.[14] Oliver-McClung asserts that the evidence was not relevant, but that if it was its probative value was substantially outweighed by the danger of unfair prejudice. We find no error in this regard.

Generally all relevant evidence is admissible. MRE 402. "Evidence is relevant if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' " *People v Watkins*, 491 Mich 450, 470; 818 NW2d 296 (2012), quoting MRE 401. In this case, the police responded to the apartment building where the sexual assaults occurred. Although they knocked on the door and announced themselves, they received no answer. Less than an hour after they left, the building burned down. An arson investigator testified that the fire originated in the same part of the building that the sexual assaults occurred. He was unable to determine conclusively what caused the fire and had no suspects; however, a police dog detected a petroleum-based accelerant. Moreover, Michael Byrd, an inmate at the Wayne County Jail who met Oliver-McClung while they were both incarcerated in the jail, testified that Oliver-McClung told him that after he learned Smith was claiming rape, his cousin returned to the apartment building and set it on fire in order to get rid of DNA evidence. According to Byrd, Oliver-McClung told him in detail about a method to burn the building without the accelerants being detected; he said that Oliver-McClung told him he knew the method worked because he had previously burned down his grandmother's house. Byrd also testified that Oliver-McClung said that the "[p]lace went up in a blaze, everything burned down, so it wasn't any possible way to find the DNA" left on the wall when he ejaculated. Given that this evidence makes it more probable that Oliver-McClung was involved in the sexual assaults, the trial court did not abuse its discretion when it determined the evidence was relevant.

Relevant evidence can be excluded if its probative value is substantially outweighed by the danger of unfair prejudice or confusion of the issues. *People v Feezel*, 486 Mich 184, 198; 783 NW2d 67 (2010) (opinion by CAVANAGH, J.), citing MRE 403. "All relevant evidence will be damaging to some extent. The fact that evidence is prejudicial does not make its admission unfair." *People v Murphy (On Remand)*, 282 Mich App 571, 582-583; 766 NW2d 303 (2009). Evidence is unfairly prejudicial if a danger exists that marginally probative evidence will be assigned undue weight by the jury. *Feezel*, 486 Mich at 198.

---

[14] We review for an abuse of discretion the trial court's decision to admit evidence. *People v Duenaz*, 306 Mich App 85, 90; 854 NW2d 531 (2014). A trial court abuses its discretion when its decision falls outside the range of principled outcomes. *Id.* Generally, "a trial court's decision on a close evidentiary question" is not an abuse of discretion. *People v Hine*, 467 Mich 242, 250; 650 NW2d 659 (2002).

Here, the probative value of the evidence was substantial. It directly linked Oliver-McClung to the destruction of the apartment building and to the possible destruction of DNA evidence. At a minimum, the evidence of a fire occurring in the building less than an hour after police left was relevant to show why DNA or other evidence was never collected from the bedroom in which the sexual assaults occurred. Accordingly, the trial court did not abuse its discretion in admitting the evidence.

Oliver-McClung also argues that the trial court erred in limiting impeachment evidence concerning Byrd's gang membership and his past dealings with the prosecutor's office. We agree that this was error but conclude that it was harmless.

Oliver-McClung sought to impeach Byrd with evidence that Byrd was a member of a gang. Oliver-McClung asserts that the evidence was relevant to show that Byrd could have obtained knowledge about how to start a fire from that gang rather than Oliver-McClung. Contrary to the trial court's findings, this evidence is relevant because it suggests that Byrd was lying about the conversation with Oliver-McClung. Coupled with testimony that Byrd had reached out to the prosecutor's office to make a deal in exchange for the information, the evidence impugns his credibility. "Evidence of a witness' bias or interest in a case is highly relevant to credibility." *People v Coleman*, 210 Mich App 1, 8; 532 NW2d 885 (1995). Accordingly, the trial court abused its discretion when it found this testimony irrelevant and therefore inadmissible.

Oliver-McClung also sought to impeach Byrd with testimony that during the last five years he had received numerous deals based on his dealings with the Wayne County prosecutor's office; however, the trial court only allowed questions relating to deals made after March 5, 2014, the date of the offense. It is apparent that Byrd's entire history as a jailhouse informant who received benefits in exchange for testimony was reflective of his credibility in this case. A juror could reasonably conclude that given the number of times Byrd entered into such an arrangement, there was a higher likelihood that his testimony was fabricated. Accordingly, the trial court abused its discretion when it limited the timeframe.

"[A] preserved, nonconstitutional error is not a ground for reversal unless 'after an examination of the entire cause, it shall affirmatively appear' that it is more probable than not that the error was outcome determinative." *People v Lukity*, 460 Mich 484, 495-496; 596 NW2d 607 (2001), quoting MCL 769.26. Here, there was overwhelming evidence that Oliver-McClung sexually assaulted Smith. Smith testified that he forced her into the room, used force to sexually assault her despite her requests that he stop, and that he aided others in also sexually assaulting her. Smith also identified him in a photo lineup as one of the individuals who sexually assaulted her Given the properly admitted evidence in this case, the error in not admitting the additional impeachment evidence regarding a single witness was not outcome determinative and is, therefore, not grounds for reversal. *Lukity*, 460 Mich at 495-496.

## VI. PROSECUTORIAL MISCONDUCT

-15-

Oliver-McClung and Love also argue that they were denied a fair trial by prosecutorial misconduct.[15] We address their claims in turn.

## A. LOVE

Love challenges the prosecutor's comments in rebuttal argument suggesting that Palmore-Bryant had not provided a reason why Love instructed Herring and Anderson to lie to the police. The prosecutor argued:

> Thank you. You know, she [Palmore-Bryant] still didn't give you a reason why he made those people lie for him at the police. She never gave you a reason. Why would he drive those people down there and make them lie to the police? Did she tell you why? No. She wants you to believe that he didn't sign his statement like he didn't make that statement. But she also wants you to believe that he didn't want to get involved. At first he wasn't there. Now he's there. He just doesn't want to get involved.
>
> * * *
>
> The lying, that was never explained. The lying, the telling the people to lie for her—for him, that's just added stuff. That's stuff that just piles on top because that's not what a person who did nothing wrong would do. Even if that's what you think you would do initially, that's not what a person would keep doing.

Love argues that the prosecutor's comments impermissibly suggested that he had a burden to prove his innocence and allowed the jury to presume his guilt from his failure to explain his alleged instructions to Herring and Anderson to lie to the police. We disagree. The prosecutor

---

[15] "In order to preserve an issue of prosecutorial misconduct, a defendant must contemporaneously object and request a curative instruction." *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010). Here, Love failed to contemporaneously object or request a curative instruction with respect to the alleged instances of prosecutorial misconduct, so this issue is unpreserved in his case. Oliver-McClung also failed to contemporaneously object or request a curative instruction with respect to the vast majority of his prosecutorial misconduct claims, so the issue is unpreserved with respect to most of his claims.

We review de novo issues of prosecutorial misconduct to determine whether the defendant was denied a fair and impartial trial. *Id*. However, unpreserved prosecutorial misconduct claims are reviewed for plain error affecting the defendant's substantial rights. *Id*. "Reversal is warranted only when plain error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Id*. Moreover, this Court "cannot find error requiring reversal where a curative instruction could have alleviated any prejudicial effect." *Id*. at 476.

may not imply that the defendant is required to prove something or to provide a reasonable explanation for damaging evidence because such an argument tends to shift the burden of proof. *People v Fyda*, 288 Mich App 446, 463-464; 793 NW2d 712 (2010). "However, a prosecutor's argument that inculpatory evidence is undisputed does not constitute improper comment." *Id*. at 464. A prosecutor may also argue that the evidence was uncontradicted even if the defendant is the only person who could have contradicted the evidence. *Id*. A prosecutor's proper commentary on the weaknesses of a defense theory does not shift the burden of proof or constitute prosecutorial misconduct. *Id*. at 464-465. Further, "[a] prosecutor's remarks must be considered in light of defense arguments." *People v Ackerman*, 257 Mich App 434, 453-454; 669 NW2d 818 (2003) (quotation marks and citation omitted). Otherwise improper remarks may not rise to the level of error requiring reversal if the remarks were responsive to defense counsel's argument. *People v Watson*, 245 Mich App 572, 593; 629 NW2d 411 (2001).

Here, challenged comments were in response to defense counsel's closing argument, which suggested that Love was not involved in the assaults and that Smith was not credible. Thus, it was reasonable for the prosecutor to highlight a weakness or unexplained aspect of this defense theory by questioning why, if Love did not commit the crimes, he would instruct witnesses to lie to the police about his presence at the party. Moreover, any prejudice was lessened by the trial court's instructions that the prosecutor had the burden of proof, that Love was not required to prove his innocence or to do anything, and that the attorneys' statements and arguments were not evidence. "Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors." *People v Abraham*, 256 Mich App 265, 279; 662 NW2d 836 (2003). Thus, we find Love's argument meritless.

Love also argues that the prosecutor argued facts not in evidence and expressed a personal opinion regarding the integrity of the live lineup identification procedure by stating that a criminal defense attorney was present during the lineup, that the attorney signed the lineup sheet, and that this signature indicated that the procedure was fair and accurate. We do not agree that there was misconduct. In general, prosecutors are accorded wide latitude in making their arguments "and are free to argue the evidence and all reasonable inferences from the evidence as they relate to their theory of the case." *People v Seals*, 285 Mich App 1, 22; 776 NW2d 314 (2009). But a prosecutor may not argue facts not in evidence or mischaracterize the evidence presented. *Watson*, 245 Mich App at 588. The prosecutor's argument concerning the integrity of the live lineup procedure was in response to defense counsel's closing argument challenging inconsistencies in Smith's descriptions and identification of Love. The live lineup sheet was admitted into evidence. The officer-in-charge testified that a criminal defense attorney was present during the lineup to ensure that it was done properly. The officer testified that the attorney signed the lineup sheet. Hence, the prosecutor's comments about the attorney's signature on the lineup sheet comprised a permissible argument based on reasonable inferences from the evidence. *Seals*, 285 Mich App at 22.

## B. OLIVER-MCCLUNG

Oliver-McClung first argues that the prosecutor denigrated his defense counsel during cross-examination of Smith, during cross-examination of jailhouse informant Byrd, and during closing argument. The prosecutor may not personally attack defense counsel. *People v*

-17-

*McLaughlin*, 258 Mich App 635, 646; 672 NW2d 860 (2003). Nor may a prosecutor suggest that defense counsel is intentionally attempting to mislead the jury. *People v Unger*, 278 Mich App 210, 236; 749 NW2d 272 (2008).

During her testimony, Smith testified that the first person who penetrated her left the bedroom. Oliver-McClung's counsel then asked her if "one of your reports indicated that was Oliver-McClung, that report would be wrong?" The prosecutor then objected and accused Oliver-McClung's counsel of mischaracterizing the evidence:

> *The prosecutor*: Objection. Judge, that's a mischaracterization.
>
> *Defense counsel*: No.
>
> *The prosecutor*: That's a mischaracterization, and he knows it. That's the worse [sic] part, is that he knows it's a mischaracterization.
>
> *Defense counsel*: That is not true, Judge, at all.
>
> *The prosecutor*: What report is he referring to?
>
> *Defense counsel*: I'm happy to do it that way, Judge.
>
> *The court*: You're talking about statements?
>
> *Defense counsel*: I'm talking about the investigator's report.
>
> *The prosecutor*: That's my point. It's not one of her statements that says that.
>
> *The court*: Okay, it's not what she said.
>
> *Defense counsel*: Well, I don't know. I have a report that says it, Judge.
>
> *The court*: I don't know either, okay, so let's not pull cheap shots.
>
> *Defense counsel*: I don't, Judge. I don't.
>
> *The court*: That was a cheap shot.
>
> *Defense counsel*: I don't believe it was.
>
> *The court*: I just said it was.

Thus, defense counsel's question suggested that one of Smith's reports was contrary to her trial testimony; however, as the record reflects, the report defense counsel was referring to was an investigator's report. As such, the prosecutor's objection that defense counsel was mischaracterizing the evidence was merited. Although the prosecutor likely should not have then suggested a deliberate mischaracterization of the testimony, any minimal prejudice was

alleviated by the trial court's instructions that the jury was to decide the case based on the evidence, which did not include the attorneys' statements. See *Abraham*, 256 Mich App at 279.

Next, during cross-examination, defense counsel asked Byrd if he was a member of a gang and Byrd responded that he was an associate. The prosecutor objected on relevance grounds. Defense counsel responded that it was impeachment evidence. The prosecutor responded, "No. You don't get to—no, absolutely not. Crimes involving theft or dishonesty are on the table within the last ten years. He knows that's a cheap shot." Although improper, the comment that defense counsel "knows that's a cheap shot," "was too fleeting and unremarkable to constitute an obvious error that denied defendant a fair trial." *McLaughlin*, 258 Mich App at 647. Further, the jury instructions served to alleviate the prejudice. See *id*.

Finally, Oliver-McClung argues that the prosecutor improperly denigrated defense counsel in rebuttal when he stated: "[Oliver-McClung] wants a jury of the defendant's peers to judge him. This was good. He would like Destiny Herring and Alison to sit where you guys are sitting instead of you all because they've already made the judgment." In addition, the prosecutor stated that "[i]f he's going to sit there and say a jury of his peers already acquitted him, well, . . . this is probably the worst argument of all. This was his worst argument, that she had some sort of perception problem." In context, it is apparent that these comments were in response to defense counsel's closing argument where defense counsel argued Oliver-McClung:

> was already judged by his peers. And peers, a bunch of kids on a Tuesday, March 4th, partying, playing the records all night, there's not one of them who's come into court and said, "He's guilty," not one—all the people that were there, whether there's 10 to 20, there's different reports have come in here and said he's guilty.

As such, the comments did not rise to the level of error requiring reversal. See *Watson*, 245 Mich App at 593. And, again, the curative instructions served to alleviate the prejudice from the prosecutor's comments. See *Abraham*, 256 Mich App at 279.

Oliver-McClung also argues that the prosecutor committed prosecutorial misconduct during closing argument, directing us to the following comments:

> That expert wasn't heavily questioned by any stretch of the imagination by the defense, all right. There was one expert that testified for you. And trust me, if there was some other theory out there and some other expert, you would have heard.

It is not clear what portion of this argument Oliver-McClung finds objectionable. However, we note that the prosecutor's argument was responsive to defense counsel's suggestion that the lack of injury undermined Smith's testimony that she was raped.

Oliver-McClung next argues that several comments made by the prosecution in rebuttal argument were improper. He does not however expressly explain how the cited comments are improper. All of the comments were generally responsive to defense counsel's closing. The

prosecutor's argument challenging whether defense counsel would know how a rape complainant would react was in direct response to defense counsel's assertion that a rape complainant would shut her eyes. The prosecutor's comments about the "undertone" of defense counsel's argument was responsive to defense counsel's argument that Smith was at a party late at night and that she was drinking and smoking marijuana. And to the extent any of the comments were improper, the prejudicial effect was alleviated by the trial court's instructions to the jury to decide the case on the evidence, which did not include the prosecutor's comments and arguments. See *Abraham*, 256 Mich App at 279.

Oliver-McClung next argues the prosecutor committed misconduct while questioning Love's mother. After Love's mother made nonresponsive comments on direct examination, the prosecutor stated, "I'm asking you a different question. Don't worry. These attorneys are going to ask you some questions, okay, and they get to clean up the mess that you make, all right?" The trial court sustained a defense objection and instructed the jury to disregard the prosecutor's last comment. Thus, any error was cured by the trial court's instructions to the jury.

Oliver-McClung also argues that the prosecutor improperly appealed to the jury to sympathize with Smith, when, during closing, she said:

> [T]here is a moment in this trial that you could not recreate if you had actors and cameras and sound effects and computers, okay. It happens in sexual assault cases. [Smith] told you she phased out after this happened. You know, she wasn't working then. During the questioning for the most part, she was fine until we got to one point. Until we got to—let's talk about what happened in the room. The very first penetration, you saw her. She sat there. She was still. She couldn't move, her eyes fixed on you, shaking her leg like I've never seen before. She couldn't answer the question. I had to get her off to a new question. There was a moment of silence there that you cannot, cannot create with Hollywood, okay. That's why the law tells you you can believe a person on their word and their word alone. That's why.

The prosecutor may not appeal to the jury to sympathize with a victim or urge the jury to convict as part of its civic duty or on the basis of prejudices. *Unger*, 278 Mich App at 237. A prosecutor may not vouch for the credibility of witnesses to suggest some special knowledge that the witnesses are testifying truthfully. *People v Bahoda*, 448 Mich 261, 276; 531 NW2d 659 (1995). A prosecutor may, however, argue from the facts and testimony that the witnesses are credible or worthy of belief. *People v Dobek*, 274 Mich App 58, 66; 732 NW2d 546 (2007). Here, the prosecutor was primarily arguing in favor of Smith's credibility by discussing her demeanor while testifying. The prosecutor did not vouch for Smith's credibility on the basis of any special knowledge. Further, to the extent the prosecutor's argument was improper, any minimal prejudice was dispelled by the trial court's instructions to the jury that the lawyers' statements and arguments are not evidence and not to let sympathy or prejudice influence its decision. See *Abraham*, 256 Mich App at 279.

Oliver-McClung next contends that the prosecutor attempted to shift the burden of proof in rebuttal closing argument by asking, "But what does this say if your own brother wouldn't

come to court? What does it say?" Defense counsel objected, and the trial court sustained the objection. The prosecutor's argument was in response to defense counsel's argument in closing that Oliver-McClung had already been judged by his "peers," i.e., the attendees of the party. The prosecutor reasonably responded to this defense argument by noting that one of those attendees did not testify, which called into question the defense theory that Oliver-McClung had been judged favorably by his "peers" who attended the party. It is also notable that before making the remark in question, the prosecutor emphasized that he had the burden of proof.[16]

Oliver-McClung next argues that the prosecutor made inferences unsupported by the evidence when the prosecutor stated in closing that Oliver-McClung "cannot fully admit in jail that that he raped the girl because he knows what would happen to him. He knows the culture of jail." According to Oliver-McClung, this comment was speculative, and the prosecutor knew that Oliver-McClung had no criminal record. "A prosecutor may not make a statement of fact to the jury that is unsupported by evidence, but she is free to argue the evidence and any reasonable inferences that may arise from the evidence." *Ackerman*, 257 Mich App at 450. The prosecutor's argument suggested a possible theory for why Oliver-McClung did not make a full confession to Byrd. Even though Oliver-McClung may have lacked a criminal record, it is reasonable to infer that he understood the culture of jail given that he was confined in jail when he talked to Byrd. But even if the prosecutor's comment was erroneous, the comment was so brief that it cannot be deemed to have denied Oliver-McClung a fair trial. *Unger*, 278 Mich App at 237. Further, any minimal prejudice was alleviated by the trial court's instructions that the attorney's statements are not evidence and to decide the case solely on the basis of the evidence. See *Abraham*, 256 Mich App at 279.

Oliver-McClung next asserts that the prosecutor assumed facts not in evidence. Smith testified that after a game was played at the birthday party, "[t]he guys start[ed] being aggressive, like too much on the girls." A short time later, the prosecutor asked Smith, "You said earlier the guys were grabbing on the girls?" Smith responded, "Yes." Oliver-McClung argues that this was a leading question and notes that the prosecutor repeated in closing argument that Smith "told you they weren't just grabbing on me, they were grabbing on other girls too." However, Smith's testimony that the guys started being too aggressive on the girls supported a reasonable inference that supported the prosecutor's characterization that the guys were grabbing the girls, so the comments were not improper.

---

[16] Oliver-McClung also argues that the trial court should have granted a mistrial on the basis of the prosecutor's statement that defense counsel did not give a reason why Smith or Byrd would lie and the prosecutor's statement about Oliver-McClung's brother not coming to court. However, "[a] mistrial is warranted only when an error or irregularity in the proceedings prejudices the defendant and impairs his ability to get a fair trial." *Waclawski,* 286 Mich App at 708 (quotation marks omitted). "A trial court should only grant a mistrial when the prejudicial effect of the error cannot be removed in any other way." *Horn*, 279 Mich App at 36. Given that the prejudicial effect of the prosecutor's comments was alleviated by the curative instruction, we conclude the trial court did not abuse its discretion in denying the motion for mistrial.

Oliver-McClung next argues that the prosecutor elicited inadmissible hearsay by asking Smith what Hawkins said to her when she returned from the hallway with Oliver-McClung. Smith responded that Hawkins told her: "You've been chosen." The trial court sustained defense counsel's objection to the testimony. On appeal, Oliver-McClung notes that the prosecutor referred to this testimony in rebuttal closing argument by saying: "What does [Smith] do? She goes outside. The defendant, Oliver-McClung, lures her back in. And what happens? You've been chosen." We conclude that the prosecutor's question comprised a good-faith effort to admit evidence, see *People v Brown*, 294 Mich App 377, 383; 811 NW2d 531 (2011), because the prosecutor could reasonably have concluded that what Hawkins said to Smith was relevant to show what happened next rather than to prove the truth of the matter asserted. See MRE 801(c) (defining "hearsay" as "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."). Oliver-McClung also argues the prosecutor's inference that Oliver-McClung went outside the apartment to lure Smith back in is unsupported by the evidence. We disagree because the prosecutor's statement that Oliver-McClung lured Smith back into the apartment is supported by a reasonable inference from the evidence, given Smith's testimony that Oliver-McClung participated in the sexual assaults after he talked to her in the hallway and she came back inside. Even if the prosecutor's question and reference to the testimony at issue were erroneous, any prejudice was alleviated by the trial court's instructions that the lawyers' questions, statements, and arguments were not evidence. See *Abraham*, 256 Mich App at 279.

Finally, Oliver-McClung argues that the prosecutor asked leading questions of Smith, including by reading some of her statement. He does not, however, identify with specificity the exact questions that he considers leading or explain how those leading questions denied Oliver-McClung a fair trial, and we find no reversible error in the prosecutor's use of leading questions.

## VII. JURY INSTRUCTION ON CONSENT

Oliver-McClung next argues that the trial court erred in refusing to instruct the jury on the defense of consent.[17] We disagree.

"Jury instructions must clearly present the case and the applicable law to the jury." *People v McGhee*, 268 Mich App 600, 606; 709 NW2d 595 (2005). "The instructions must include all elements of the charged offenses and material issues, defenses, and theories if supported by the evidence." *Id*. "When a defendant requests a jury instruction on a theory or defense that is supported by the evidence, the trial court must give the instruction." *People v Riddle*, 467 Mich 116, 124; 649 NW2d 30 (2002).

Oliver-McClung requested that the court read the provision of former CJI2d 20.27, which stated, in relevant part: "There has been evidence in this case about the defense of consent. A person consents to a sexual act by agreeing to it freely and willingly, without being forced or coerced." See former CJI2d 20.27(1). "In the context of the CSC statutes, consent can be utilized as a defense to negate the elements of force or coercion." *People v Waltonen*, 272 Mich App 678, 689; 728 NW2d 881 (2006). An instruction on consent is required only if there is evidence of consent. See *People v Stull*, 127 Mich App 14, 19; 338 NW2d 403 (1983).

Here, there was no evidence that Smith consented. Oliver-McClung, however, asserts that during the preliminary examination his attorney asked "Isn't it true that my client never forced you to have sex?" and Smith replied, "I don't know." This testimony is not substantive evidence that Smith consented to engaging in sexual intercourse with Oliver-McClung. It is impeachment evidence used to suggest that Smith's testimony at trial that she did not consent to sexual intercourse with Oliver-McClung and that he forced himself upon her was not truthful. At trial, there was no substantive evidence that she consented.[18]

---

[17] A claim of instructional error involving a question of law is reviewed de novo, but the trial court's determination of whether a jury instruction applies to the facts of a case is reviewed for an abuse of discretion. *People v Dupree*, 486 Mich 693, 702; 788 NW2d 399 (2010). "There is no error requiring reversal if, on balance, the instructions fairly present the issues to be tried and sufficiently protect the defendant's rights." *People v Heikkinen*, 250 Mich App 322, 327; 646 NW2d 190 (2002).

[18] Moreover, even if we were to construe this testimony as evidence that Smith consented, we would nevertheless conclude that the jury instructions given were sufficient to fairly present the issues. In instructing the jury on the elements of CSC-I, the trial court stated that the prosecutor was required to prove that Oliver-McClung used force or coercion to commit the sexual acts. The court explained that "[f]orce or coercion means that the defendant either used physical force or did something to make [Smith] reasonably afraid of present or future danger." A defendant's use of force or coercion implies a lack of consent. See *People v Khan*, 80 Mich App 605, 619 n 5; 264 NW2d 360 (1978). The trial court thus implicitly instructed the jury that it could not

Oliver-McClung also suggests that the lack of injury to Smith and the testimony that she willingly went into the bedroom with Oliver-McClung and the others is evidence of consent. However, the SANE nurse testified that in the majority of CSC cases there will be no signs of injury. Further, the testimony that Smith willingly went into the room is not evidence that she then willingly consented to engage in sexual intercourse with Oliver-McClung or any of the other individuals in the room. Accordingly, neither the fact that Smith was uninjured nor the fact that witnesses testified she willingly entered the room were, standing alone, sufficient to establish consent to sexual penetration. Given that there was no substantive evidence of consent, the trial court did not err in declining to instruct the jury on consent.

## VIII. SENTENCING

Oliver-McClung argues that he is entitled to resentencing because the trial court erred in scoring offense variable (OV) 10 at ten points and the scoring error affected the sentencing guidelines range.[19] Here, in order to score OV 10 at ten points, the trial court had to find by a preponderance of the evidence that Oliver-McClung "exploited a victim's physical disability, mental disability, youth or agedness, or a domestic relationship, or the offender abused his or her authority status." MCL 777.40(1)(b). " 'Exploit' means to manipulate a victim for selfish or unethical purposes." MCL 777.40(3)(b). " 'Abuse of authority status' means a victim was exploited out of fear or deference to an authority figure, including, but not limited to, a parent, physician, or teacher." MCL 777.40(3)(d). There is, however, no evidence that Oliver-McClung exploited Smith's physical disability, mental disability, youth or agedness, or a domestic relationship, or that he abused any authority status that he held. Correction of this scoring error reduces Oliver-McClung's total OV level from 100 to 90, thereby changing his guidelines range from 135 to 225 months to 126 to 210 months. See MCL 777.62. Because the scoring error changed the guidelines range, resentencing is required. *Francisco*, 474 Mich at 89-91.

Oliver-McClung and Love also argue that their sentences were constrained by judicial fact-finding in violation of the Sixth Amendment to the United States Constitution. However, given that we are remanding for a *Ginther* hearing in Love's case, we decline to address his *Lockridge* argument at this time. Further, given that we are remanding for resentencing in Oliver-McClung's case, we need not remand for a *Crosby*[20] proceeding under *Lockridge*.

## IX. COSTS

---

convict Oliver-McClung if Smith consented, given that the jury was told it could convict only if there was evidence that Oliver-McClung forced or coerced Smith. See *id*. at 619 n 5. Accordingly, read in their entirety, the jury instructions fairly presented the issues to be tried and sufficiently protected Oliver-McClung's rights. *Heikkinen*, 250 Mich App at 327.

[19] "Under the sentencing guidelines, the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence." *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013) (citations omitted).

[20] *United States v Crosby*, 397 F3d 103 (CA 2, 2005).

Finally, Oliver-McClung argues that in light of our Supreme Court's decision in *People v Cunningham*, 496 Mich 145; 852 NW2d 118 (2014) the trial court erred in imposing $600 in court costs at sentencing. At oral argument, however, Oliver-McClung's counsel acknowledged that *Cunningham* no longer controls and conceded that the trial court had the authority to impose the costs. He requests that we remand for a determination as to reasonableness of the fees imposed. Given that we are remanding for resentencing, if the trial court again decides to impose costs, the court should give a factual basis for the costs imposed to reflect that the costs imposed are reasonably related to the actual costs involved. See MCL 769.1k(b)(*iii*).

## X. CONCLUSION

In Docket Nos. 329217 and 324992, we reverse the trial court's order granting Love a new trial pursuant to *Cronic*, and remand for an evidentiary hearing and findings regarding Love's *Strickland* claim. We reject all of Love's remaining claims of error, save for his challenge under *Lockridge*, which we do not reach. We retain jurisdiction in Love's case. In Docket No. 325107, we affirm Oliver-McClung's convictions, but remand for resentencing. On resentencing, should the court choose to again impose costs, it should establish a factual basis for the costs imposed. We do not retain jurisdiction in Oliver-McClung's case.

/s/ Michael F. Gadola
/s/ Deborah A. Servitto
/s/ Douglas B. Shapiro

-25-